IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| Beverly Munguia; Ruben Munguia,<br><br>          Plaintiffs,<br><br>     vs.<br><br>Grelyn of Maui, LLC,<br><br>          Defendants. | Civ. No. 09-00058 HG-BMK |

**ORDER DENYING DEFENDANT GRELYN OF MAUI, LLC'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY, FOR NEW TRIAL OR FOR REMITTITUR, AND DENYING PLAINTIFFS BEVERLY AND RUBEN MUNGUIA'S MOTION FOR RULE 11 SANCTIONS**

Plaintiff Beverly Munguia received a jury verdict in her favor, and was awarded $2,670,227.55 in special damages and $3,000,000 in general damages. At the end of Plaintiffs' presentation of their case, Defendant Grelyn of Maui, LLC filed a Motion for Judgment as Matter of Law, which the Court denied. Defendant has now filed a RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY, FOR NEW TRIAL OR FOR REMITTITUR. (Doc. 155). Plaintiffs have also filed a MOTION FOR RULE 11 SANCTIONS. (Doc. 168). Both Motions are **DENIED**.


**PROCEDURAL HISTORY**

On February 12, 2009, Plaintiffs filed a Complaint. (Doc. 1).

On March 24, 2009, Defendant filed an Answer. (Doc. 7).

On September 28, 2010, a Jury Trial commenced. (<u>See</u> Doc. 131).

On October 5, 2010, Defendant filed a Motion for Judgment as a Matter of Law, which was denied by the Court on the same date. (Docs. 138, 141).

On October 7, 2010, the jury returned a verdict in favor of Plaintiff Beverly Munguia. (<u>See</u> Doc. 146). No damages were awarded to Plaintiff Ruben Munguia. (<u>Id.</u>).

On October 12, 2010, the Clerk of the Court entered Judgment. (Doc. 151).

On November 8, 2010, Defendant filed a Renewed Motion for Judgment as a Matter of Law or Alternatively, for New Trial or for Remittitur. (Doc. 155).

On November 23, 2010, Plaintiffs filed an Opposition. (Doc. 165).

On December 7, 2010, Defendant filed a Reply. (Doc. 170).

On December 7, 2010, Plaintiffs filed a Motion for Rule 11 Sanctions. (Doc. 168).

On December 27, 2010, Defendant filed an Opposition to the Motion for Rule 11 Sanctions. (Doc. 174).

On January 14, 2011, Plaintiffs filed a Reply in support of the Motion for Rule 11 Sanctions. (Doc. 175).

On February 25, 2011, the Court issued a Minute Order denying the Renewed Motion for Judgment as a Matter of Law or Alternatively, for New Trial or for Remittitur, and denying the

Motion for Rule 11 Sanctions. (Doc. 176). The Court stated that a written order would issue at a later date. This Order provides the reasons for the Court's February 25, 2011 ruling.

## BACKGROUND

On November 25, 2007, Plaintiffs Beverly and Ruben Munguia went to a McDonald's restaurant in Kahului, Maui for breakfast. (Transcript of Trial, September 28, 2010, at 11 (Doc. 156); Transcript of Trial, October 4, 2010, at 3 (Doc. 159)). They were accompanied by Mrs. Munguia's sister, Rebecca Presley, and a four-year old child named Mila who Mrs. Munguia described as her "hanai granddaughter."[1] (Transcript of Trial, October 4, 2010, at 3 (Doc. 159)). After placing their order, the four sat down at a corner table. (Id. at 8-11). Mrs. Munguia then stood up, intending to go to the drink machine. (Id. at 11).

Mrs. Munguia testified that she stepped forward with her left

---

[1] At trial, Plaintiffs' counsel described Mila as the Munguia's "hanai grandaughter." (Transcript of Trial, September 28, 2010, at 30 (Doc. 156)). Mrs. Munguia testified that Mila is her "hanai granddaughter." (Transcript of Trial, October 4, 2010, at 96 (Doc. 159)). Mrs. Munguia's sister, Rebecca Presley, testified that Mila is the daughter of Kanoe, who is the daughter of one of Ms. Presley's closest friends. (Id. at 68). "[W]hen Kanoe grew up and had her first child," Ms. Presely testified, "Mila became my granddaughter, as are her other two little sisters." (Id.). The Hawaiian word "hanai" is translated as adopted or foster child, and is sometimes used to refer to an informal (rather than legally binding) adoptive relationship to a child. See Hawaiian Dictionary: Revised and Enlarged Edition 57 (Mary Kawena Pukui & Samuel H. Elbert eds., 1986)

foot and hit a slippery spot on the floor, causing her left leg to slide forward and out from under her. (Id. at 12-13). She testified that she fell quickly to the floor and landed on her buttocks. (Id. at 13). She stated that she immediately heard a popping sound, and then felt extreme pain in her lower back. (Id. at 13). In reaction to the extreme pain, she testified that she rolled to her front side, laying on her belly. (Id. at 14).

Mrs. Munguia was severely injured by the fall. (Transcript of Dr. Timothy Hopkins's video-taped deposition, entered into evidence at trial, at 45 (Doc. 89-1)). Mrs. Munguia's neurosurgeon, Dr. Timothy Hopkins, testified that her L-1 vertebra in her lower back was fractured in a manner consistent with her description of having fallen onto her buttocks. (Id. at 11, 45). As a result of her injury, Dr. Hopkins performed a surgery on Mrs. Munguia, which involved the placement of rods and screws in her lower back. (Id. at 16-17, 27). After her surgery, Mrs. Munguia suffered a spontaneous fracture in her L-4 vertebra. (Id. at 27). Dr. Hopkins testified that the instruments placed in her back as a result of her injury likely contributed to causing the fracture, in combination with her osteoporosis. (Id.). As a result of her injuries, Mrs. Munguia was left with a deformity in her back that forces her to walk with a stoop and significantly limits her ability to move. (Id. at 35).

Dr. Rodney Isom, a rehabilitation consultant, testified that

in the future Mrs. Munguia would continue to be largely confined to a wheelchair for mobility and only able to take a few steps. (Transcript of Trial, October 1, 2010, at 18-19 (Doc. 158)).  He testified that she would be permanently disabled from work, suffer chronic pain, and require assistance for basic daily living needs. (Id. at 19).  Plaintiffs submitted evidence that a life-care plan for Mrs. Munguia would cost approximately $2,100,000, and that she had lost wages in excess of $480,000. (See Transcript of Trial, October 5, 2010, at 15 (Doc. 160); Trial Exhibits 64, 65, 68). Dr. Robert Male, an economic damages expert, testified that Mrs. Munguia would suffer a total economic damages loss of $2,654,100. (Transcript of Trial, October 5, 2010, at 16 (Doc. 160))

Mrs. Munguia testified regarding the extreme emotional and physical hardship she experiences as a result of her injuries.  She testified that her inability to work is a source of great sadness and depression, that she is pained that her daughter is afraid to let her hold her grandchildren, and that she is forced to decide on a daily basis whether to suffer extreme physical pain or take medication that puts her in a foggy mental state. (Transcript of Trial, October 4, 2010 at 35-41 (Doc. 159)).

Defendant Grelyn of Maui, LLC owns the McDonald's restaurant where Mrs. Munguia fell, which it operates through a franchise agreement with the McDonald's Corporation. (Transcript of Trial, September 29, 2010, at 3-4 (Doc. 148)).  Mrs. Munguia testified

that her fall was caused by a slippery substance on the floor. (Transcript of Trial, October 4, 2010, at 12-13 (Doc. 159)). She sought damages for Defendant's negligent failure to take reasonable action to discover and remove it. (Transcript of Trial, September 28, 2010, at 27-30 (Doc. 156)). Although Mrs. Munguia testified that she felt something on the floor with her foot, and later saw something darkish that was about the size of a quarter near where she fell, the substance that she slipped on was never identified. (Transcript of Trial, October 4, 2010, at 12, 20 (Doc. 159)). Mrs. Munguia's sister, Rebecca Presley, testified that she saw a quarter-sized spot of a syrup-like substance on the floor near where the accident occurred, and that it reminded her of a "McGriddle" breakfast sandwich. (Id. at 83).

Lea Rasos, the operations manager at the McDonald's where Mrs. Munguia fell, testified that the McDonald's Corporation provides franchisees with training manuals containing various protocols that must be followed to ensure a safe and clean restaurant. (Transcript of Trial, September 29, 2010, at 75, 84 (Doc. 148)). The guide prescribes a series of cleaning steps, methods of cleaning, and hazard observation duties. (Id. at 69-84). Ms. Rasos and other employees testified that several of the McDonald's Corporation's cleaning and floor safety protocols were not followed at the McDonald's where Mrs. Munguia fell. (Id. at 69-77).

Ms. Rasos testified that contrary to the McDonald's

Corporations manual the crew would not damp mop the dining room floor five times a day, were not instructed to allow the cleaning solution to soak into the floor for 3-5 minutes during the evening mopping, did not use a hi-low brush to scrub the floors, and were not instructed to use a liberally wet mop at closing time. (Transcript of Trial, September 29, 2010, at 69-77 (Doc. 148)).

Clifford Villahermosa, an employee who would perform the closing moppings, testified that he did not use a full bucket of water per McDonald's recommended cleaning procedures. (Id. at 128). Mr. Villahermosa gave ambiguous testimony regarding whether or not he would change the water as soon as it became dirty, as required. (Id. at 128-131). He appeared to contradict his previous deposition testimony, which suggested he would not do so. (See Id. at 128-131).

Ms. Rasos testified that there was no "lot and lobby" person scheduled to monitor the dining room floor on the day of the accident. (Transcript of Trial, September 29, 2010, at 42-45 (Doc. 148)). The purpose of having a lot and lobby person, Ms. Rasos explained, was to attend to any spills or mishaps that happen in the dinning room. (Id.). Although a maintenance person was scheduled to work on the day of Mrs. Munguia's fall, Ms. Rasos testified that the maintenance person is a different position and does not fulfill the lot and lobby role. (Id. at 45). Camilo Lubera, the maintenance person working on the day of Mrs. Munguia's

fall, testified that he would examine the floor when he was walking through it, but that his maintenance duties required him to spend part of the morning outside in the parking lot. (Transcript of Trial, September 30, 2010, at 101, 104 (Doc. 157)).

Layne Kushiyama, the manager on duty on the day of Mrs. Munguia's fall, testified that as the manager he was required to be located either at the counter or in the dining room during the rush "lockdown" hours, including breakfast time. (Transcript of Trial, September 29, 2010, at 146 (Doc. 148)). Mr. Kushiyama gave conflicting and somewhat ambiguous testimony about where he was located at the time of Mrs. Munguia's fall. He first testified that he was at the counter, but then stated that he may have gone into the office to get something, he didn't remember. (Id. at 147-148). He admitted that he had previously testified in his deposition that he was in the office at the time that Mrs. Munguia fell. (Id.). Mr. Kushiyama also testified that as the manager he was required to perform a "travel path" inspection of the dining room floors and other areas at least once every 15 minutes during high traffic hours. (Id. at 144-145). Although the McDonald's Corporation recommends that a timer be used to remind the manager of this duty, Mr. Kushiyama testified that he did not use a timer or use any sign-in sheet to record that he had performed the travel paths. (Id. at 145).

An expert in the areas of human factors and risk management

for safety engineering, Richard Gill, testified for the Plaintiffs. (Transcript of Trial, September 30, 2010, (Doc. 157)). Based on his investigation of the accident and tests of the floor tiles near where Mrs. Munguia fell, he determined that Defendant's failure to follow McDonald's cleaning and safety rules resulted in grease buildup on the floor. (<u>Id.</u> at 22, 40).

Dr. Gill also testified about the footwear that Mrs. Munguia was wearing when she fell, a sandal on her left foot and a medical boot on her right foot, and whether they could have played a role in her fall. (<u>Id.</u> at 43-47). Mrs. Munguia had been suffering from tendinitis in the days before her fall, and was wearing a special boot on her right foot designed to alleviate it. Based on Mrs. Munguia's description of her fall and testing of her footwear, Dr. Gill concluded that the boot did not play a role in her fall. (<u>Id.</u>). Dr. Gill also concluded, based on his testing of the traction of her footwear and the floor tiles, that Mrs. Munguia would not have slipped in the manner she described unless there was an additional contaminant, in addition to the grease buildup, on the floor. (<u>Id.</u> at 22, 40).

The jury returned a verdict in Mrs. Munguia's favor, finding that Defendant was negligent, and that Defendant's negligence was the legal cause of Beverly Munguia's injuries. (Special Verdict Form (Doc. 146)). The jury found that Beverly Munguia suffered $2,670,227.55 in special damages, and $3,000,000 in general

damages, for which Defendant is 100 percent responsible. (<u>Id.</u> at 3-4).  No damages were awarded to Plaintiff Ruben Munguia. (<u>Id.</u>

**THE MOTIONS BEFORE THE COURT**

Defendant moves for judgment as a matter of law on the grounds that: (1) Plaintiffs failed to prove facts necessary for the application of the "mode of operation" rule; and (2) Plaintiffs failed to provide sufficient evidence under general premises liability law.  Alternatively, Defendant moves for a new trial or remittitur on the grounds that: (1) the jury was improperly instructed on the "mode of operation" rule; (2) the verdict is contrary to the clear weight of the evidence; and (3) the damages award is excessive.

Plaintiffs move for Rule 11 sanctions on the ground that Defendant made factual contentions without evidentiary support in its Motion for Judgment as a Matter of law, or Alternative Motion for a New Trial or Remittitur.

These Motions, and arguments in support, are considered in turn.

**I.   Renewed Motion for Judgment as a Matter of Law**

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 50(b) allows a party to file a renewed motion for judgment as a matter of law after entry of

judgment on a jury verdict.  To file a renewed motion under Rule 50(b), a party must first file a motion for judgment as a matter of law under Rule 50(a) before the case is submitted to the jury. E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009).  If the court denies or defers ruling on the Rule 50(a) motion and the jury returns a verdict against the moving party, the party may then renew the motion under Rule 50(b). Id.  Because it is a "renewed" motion, a party cannot "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." Id. (quoting Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003)).

In ruling on a 50(b) motion, the Court may allow judgment on the verdict, order a new trial, or reverse the jury and direct the entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).  The court will direct judgment as a matter of law if "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." Go Daddy Software, Inc., 581 F.3d at 961 (quoting Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006)).  When considering the motion, the court "may not make credibility determinations or weigh the evidence." Id. (quoting Reeves v. Sanderson Plumbling Prods., Inc., 530 U.S. 133, 150 (2000)).  Instead, the court reviews the evidence "in the light most favorable to the nonmoving party" and draws "all reasonable inferences in that party's favor." Id. (quoting Josephs, 443 F.3d

at 1062)). "While the district court may not resolve conflicts in the testimony or weigh the evidence, it may evaluate evidence at least to the extent of determining whether there is substantial evidence to support the verdict. '[A] mere scintilla of evidence will not suffice.'" <u>Von Zuckerstein v. Argonne Nat'l Laboratory</u>, 984 F.2d 1467, 1471 (7th Cir. 1993) (citing <u>La Montagne v. American Convenience Products, Inc.</u>, 750 F.2d 1405, 1410 (7th Cir. 1984)).

The Ninth Circuit has defined substantial evidence as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." <u>Maynard v. City of San Jose</u>, 37 F.3d 1396, 1404 (9th Cir. 1994) (citing <u>George v. City of Long Beach</u>, 973 F.2d 706, 709 (9th Cir. 1992)).


**ANALYSIS**

Defendant argues that it is entitled to judgment as a matter of law because Plaintiffs: (1) did not present sufficient evidence to support a finding that Defendant is liable under the "mode of operation" rule; and (2) did not present sufficient evidence to support liability under general premises liability law. Because the Court finds that Plaintiffs provided sufficient evidence to support the jury's finding of liability under the "mode of operation" rule, the Court does not reach the question of whether Plaintiffs provided sufficient evidence for Defendant to be found

liable under general premises liability law.

**A. There Was Sufficient Evidence To Support A Finding That Defendant Is Liable Under The Mode of Operation Rule**

Under general premises liability law in Hawaii, a business proprietor has a duty to take reasonable steps to eliminate or adequately warn customers of unreasonable hazards that the proprietor knows about or should have known about. <u>Corbett v. Assn. Of Apt. Owners  Of Wailua Bayview Apts.</u>, 772 P.2d 693, 695 (Haw. 1989); <u>Gump v. Wal-Mart Stores, Inc.</u>, 5 P.3d 407, 410 (Haw. 2000). A negligence claim under general premises liability in Hawaii requires a showing of knowledge. <u>Gump</u>, 5 P.3d at 410-411. A plaintiff must prove that the owner had actual notice of the specific hazard that caused the plaintiff to be injured. <u>Id.</u>

The "mode of operation" rule adopted by the Hawaii Supreme Court provides an exception in which actual notice of the specific risk need not be proven, and is instead imputed to the owner. <u>Id.</u> The mode of operation rule provides:

> [W]here a plaintiff is able to demonstrate that the business proprietor adopted a marketing method or mode of operation in which a dangerous condition is reasonably foreseeable and the proprietor fails to take reasonable action to discover and remove the dangerous condition, the injured party may recover without showing actual notice or constructive knowledge of the specific instrumentality of the accident.

<u>Id</u>. at 410 (quoting <u>Gump v. Wal-Mart Stores, Inc.</u>, 5 P.3d 418, 431 (Haw. Ct. App. 1999)).  If a business owner uses a mode of operation that produces foreseeable hazards, notice of the specific

13

hazards that result from the mode of operation is imputed to the owner.

To prove that Defendant is liable for negligence under the "mode of operation" rule, Plaintiffs were required to submit evidence that:

> (1) Defendant utilized a mode of operation with a reasonably foreseeable dangerous condition;
>
> (2) The dangerous condition caused Plaintiffs to be injured; and
>
> (3) Defendant negligently failed to take reasonable action to discover and remove the dangerous condition.

See Gump, 5 P.3d at 410-411. Plaintiffs presented sufficient evidence to establish each of these elements.

### 1. Evidence That Defendant Utilized A Mode Of Operation With A Reasonably Foreseeable Dangerous Condition

To establish the first of the three basic elements necessary for a finding of liability for negligence under the mode of operation rule, Plaintiffs were required to present evidence that Defendant utilized a mode of operation that produced a reasonably foreseeable and regularly occurring slip and fall danger. Plaintiff presented sufficient evidence to establish this element. Defendant's operations manager, Lea Rasos, testified that Defendant's self-service mode of operation produces a risk of falling food and greasy build up on the floors, creating a regular slip and fall danger. Her relevant testimony is set forth below.

Defendant does not dispute that the self-service nature of its restaurant creates this danger, but argues that its "self-service" characteristic cannot, as a matter of law, constitute a "mode of operation" for purposes of the "mode of operation" rule. Hawaii law is clear that the "self-service" method used at the McDonald's restaurant in question is a "mode of operation" as defined by the "mode of operation" rule.

**Testimony from Lea Rasos**

Defendant's operations manager, Lea Rasos, testified that keeping the restaurant floors clean is one of Defendant's primary safety concerns. (Transcript of Trial, September 29, 2010, at 18 (Doc. 148)). She explained that a risk of dangerously slippery floors is a concern because Defendant's McDonald's is a self-service restaurant, and customers sometimes spill food products on the floor:

> Q.  [Plaintiff's counsel] [T]he manner in which it's served, to the customers, involves customers going out to the counter, and getting the food for themselves, and bringing it to their seats; yes?
>
> A.  [Lea Rasos] Yes, that's the nature of the business, sir.
>
> Q.  Right.
>
> A.  This is a self-serve restaurant.
>
> Q.  That's right. And they will eat, clean up after themselves, preferably, and dispose of their rubbish afterwards?

```
      A.    Yes, sir.

      Q.    And as part of that, you know, Grelyn knows that
            customers will, in spite of their best efforts,
            spill and drop food on the ground throughout the
            course of the day; yes?

      A.    Yes, they do, if we don't catch it, then they would
            still.  But there's always there – somebody to
            catch it.

      . . .

      Q.    And when food is dropped on the floor, in your
            restaurant, that can create a slipping hazard for
            customers; yes?

      A.    Maybe so, if it's not – if it doesn't get cleaned
            right away.
```

(Id. at 20-22).  Ms. Rasos further explained that grease from

McDonald's food products can build up on the floors and create a

slipping hazard:

```
      Q.    [T]he reason [that keeping the floors clean is a
            primary safety concern] is because of the type of
            food that is served at McDonald's, in that it tends
            to – no offense – have a lot of grease and oil
            associated with it?

      A.    I could say yes; but, you know, I – I believe that
            most of the grease would be where the production
            area is, not basically in the dining room.

      . . .

      Q.    If your employees, say, aren't mopping the floor or
            cleaning the floor the way you want them to in the
            evening times, one of your concerns is that there
            will be a grease buildup on the dining room floor?

      A.    Yes.

      Q.    Okay. And that buildup is something that can create
            a hazardous condition for customers from a slip?
```

A.   Yes.

Q.   Okay. And particularly so if something else is spilled on top of it; correct?

A.   Yes.

(Id. at 18, 28-29).

This uncontroverted testimony from Ms. Rasos's was sufficient to establish that Defendant's McDonald's restaurant utilized a mode of operation involving the "self-service" of greasy food products, and that this mode of operation created a reasonably foreseeable and regularly occurring slip and fall danger.

**Defendant's Self-Service Method is a Mode of Operation for Purposes of Applying the Mode of Operation Rule**

Defendant does not dispute that the "self-service" nature of its McDonald's restaurant produces a reasonably foreseeable risk of slippery floors, but argues that "self-service" of greasy food does not constitute a "mode of operation" for purposes of applying the "mode of operation" rule. Defendant contends that, "As a matter of law, the fact that an operation involves 'self-service' features is not enough to justify application of the 'mode of operation' rule." (Renewed Motion for Judgment as a Matter of Law at 11 (Doc. 155)).

Before trial, Defendant objected to the jury being given an instruction on the mode of operation rule on the same ground. After reviewing Hawaii case-law, the Court ruled that the instruction would be given if evidence was presented at trial that showed Defendant's mode of operation created a reasonably

foreseeable risk of harm. (September 27, 2010 Minute Order at 129 (Doc. 129)). Ms. Rasos's uncontroverted testimony, cited above, provided sufficient evidence that Defendant's mode of operation created a reasonably foreseeable risk of harm. The mode of operation instruction was thus warranted by the evidence. As stated, Defendant does not dispute that there is an inherent risk in the self-service nature of its restaurant that customers will drop food and grease will accumulate on the floors, creating slip and fall hazards.

Defendant's suggestion that its fast-food, "self-service" method cannot constitute a "mode of operation" for purposes of applying the mode of operation rule of liability is manifestly contrary to Hawaii law. In <u>Gump v. Wal-Mart Stores, Inc.</u>, the Hawaii Supreme Court ruled that the self-service consumption of food products from a McDonald's restaurant located within a Wal-Mart constituted a "mode of operation" for purposes of the "mode of operation" rule. 5 P.3d at 409. Setting forth the parameters of the rule, the Hawaii Supreme Court held:

> [The mode of operation rule] is limited to the circumstances of this case, wherein a commercial establishment, because of its mode of operation, has knowingly allowed the consumption of ready-to-eat food within its general shopping area.

<u>Id.</u> In <u>Gump</u>, a Wal-Mart customer slipped on a french-fry derived from a McDonald's restaurant located within the Wal-Mart store. <u>Id.</u> The Hawaii Supreme Court held that Wal-Mart's decision to lease

store space to McDonald's, and to allow McDonald's customers to carry their food into the store, constituted a "mode of operation" that provided Wal-Mart with constructive notice of fallen McDonald's food products. <u>Id.</u> at 411. The court reasoned that because Wal-Mart had "knowingly allowed patrons to carry McDonald's food items throughout the store, realizing that some items will foreseeably be dropped," it had "constructive notice that fallen McDonald's food could create a potential safety hazard." <u>Id.</u>

The same reasoning applies to the circumstances in this case. Defendant knowingly allows customers to serve themselves and dispose of their food products, creating a risk of falling food in the dining area of its restaurant. This is precisely the same risk that the <u>Gump</u> court identified. The risk of falling food inherent in Wal-Mart's mode of operation (maintaining a McDonald's restaurant within the store) is even greater in the McDonald's restaurant itself, where the food is produced and "self-served."

In a more recent case, <u>Moyle v. Y&Y Hyup Shin, Corp.</u>, 191 P.3d 1062, 1073 (Haw. 2008), the Hawaii Supreme Court confirmed that the "mode of operation" rule applies to "self-service" operations that involve a risk of falling food:

> [T]he "mode of operation rule" doctrine has been limited almost entirely to "self-service" and "big box" store slip and fall cases, as the convenience offered to customers through their ability to serve themselves, a marketing strategy, is also fraught with the danger of spills causing hazardous floor conditions.

<u>Moyle</u> confirms that under Hawaii law the "mode of operation" rule

applies to the self-service nature of Defendant's McDonald's.

**Conclusion**

There was sufficient evidence to support the first of the three basic elements necessary for a finding of liability for negligence under the mode of operation rule. There was sufficient evidence that Defendant's McDonald's restaurant utilized a mode of operation involving the "self-service" of greasy food products, and that this mode of operation created a reasonably foreseeable and regularly occurring slip and fall danger. The "self-service" nature of Defendant's McDonald's restaurant constitutes a "mode of operation" for purposes of applying the "mode of operation" rule under Hawaii law. See Gump v. Wal-Mart Stores, Inc., 5 P.3d 407, 410 (Haw. 2000); Moyle v. Y&Y Hyup Shin Corp., 191 P.3d 1062, 1073 (Haw. 2008).

### 2. Evidence That A Dangerous Condition From Defendant's Mode Of Operation Caused Plaintiffs To Be Injured

To establish the second of the three basic elements necessary for a finding of liability for negligence under the mode of operation rule, Plaintiffs were required to submit evidence that a dangerous condition resulting from Defendant's mode of operation caused Plaintiffs to be injured. There was sufficient evidence for a reasonable jury to conclude that Defendant's mode of operation resulted in a dangerous condition, a slippery floor, that caused

Mrs. Munguia to be injured. There was evidence that Mrs. Munguia's fall was caused by a McDonald's product (or combination of products). As described in more detail below, such evidence included testimony from Mrs. Munguia, Mrs.'s Munguia's sister, Rebecca Presley, and Plaintiffs' expert witness, Richard Gill. Although Defendant's employees Layne Kushiyama and Lubern Rosario testified that they did not see a substance on the floor after the fall, a reasonable jury could conclude that the evidence on the whole showed that Mrs. Munguia fell on a slippery substance derived from Defendant's restaurant.

Defendant's principal argument to the contrary is that there was no evidence that Mrs. Munguia's fall was caused by a McDonald's product because the substance that she slipped on was never identified. As discussed below, Plaintiffs did not need to identify the precise substance; there was sufficient circumstantial evidence that it was derived from Defendant's mode of operation. Defendant also argues that Mrs. Munguia's description of her fall was a physical impossibility because she was seen lying on her stomach by witnesses. Evidence that Mrs. Munguia was lying on her stomach after her fall does not discredit her testimony that she fell on her buttocks; such evidence is consistent with her testimony that she immediately rolled onto her stomach after her fall due to the pain in her lower back.

**Testimony from Mrs. Munguia and Ms. Presley**

Both Mrs. Munguia and her sister, Ms. Presley, testified that there was something on the floor near where Mrs. Munguia stepped. Mrs. Munguia first testified that her foot contacted something on the floor that caused her to slip:

> A.   [Mrs. Munguia] As soon as I made my turn [after arising from the booth], I stepped out on my left foot.  And as soon as I stepped out with my left foot, it came in contact with something on the floor that made me realize I was  slipping, and I was going to fall.

(Transcript of Trial, October 4, 2010 at 12-13 (Doc. 159)).  Mrs. Munguia testified that after her fall she looked at the floor near where she fell, and saw something darkish and about the size of a quarter:

> Q.   [Plaintiffs' counsel] Do you remember, at any point, [the McDonald's manager] asking you or your sister if you knew what you slipped on?
>
> A.   I don't recall if he asked specifically what it was, and I don't remember how it came to be that he acknowledged what was seen on the floor.  My sister stated to him the area where I had slipped and fallen.  And she looked over to the area.  At that time, I looked over toward that area, and the manager looked over toward that area by raising up to see over that area.  And when he did, when she said something to the effect there it is, or that's it, he – he acknowledged, "uh-huh."
>
> . . .
>
> Q.   Okay.  And when you looked over, could you see what your sister was showing to the manager?
>
> A.   Yes, I saw it.
>
> Q.   And what was is it that you saw to the best you can

remember?

A.   The best that I can recall, it was about the size
     of a quarter, and it appeared to have kind of a
     darkish color.  Not pitch black but just dark.

Q.   Do you remember the shape?

A.   It was roundish.

(Id. at 19-20)

Mrs. Munguia's testimony was consistent with her sister's testimony.  Her sister, Ms. Presley, testified that she saw a quarter-sized syrup-like spot on the floor near where Mrs. Munguia slipped:

A.   [Ms. Presley] . . . [T]he manager then asked us if
     there was anything on the floor.  And until that
     point, I hadn't even looked at the floor or thought
     about looking at the floor.  My only concern was
     Bev.  And when I looked down to my right, there was
     a spot on the floor.  And as my sister said, it is
     – it was a quarter-size.  And I turned to the
     manager, and I said, "There is a spot on the
     floor."  And I scooted my chair back.  He leaned
     over me, and looked down, and said, "Uh-huh."

. . .

A.   It was syrupy or something else, an it had little
     black dots in it. . . .

. . .

A.   It reminded me of a McGriddle.

(Id. at 72, 83).  Based on Mrs. Munguia's and Ms. Presley's testimony, a reasonable jury could infer that Mrs. Munguia slipped on a product that came from Defendant's restaurant.

23

**Testimony from Richard Gill**

Mrs. Munguia and Ms. Presley's testimony was supported by testimony from an expert witness, Richard Gill. Richard Gill testified that he has a Ph.D. in mechanical engineering, with a specialization in human factors, and that he worked as a human factors engineer for the Air Force. (Transcript of Trial, September 30, 2010, at 2-11 (Doc. 157)). He testified that he has spent 22 years in academia in the field, and has considerable experience working as a consultant to private companies on safety and risk management issues. (Id.). He testified that he has investigated hundreds of slip and fall cases, and has frequently acted as an expert witness for both plaintiffs and defendants in slip and fall lawsuits. The parties stipulated that Dr. Gill is an expert in the areas of human factors and risk management for safety engineering.

Dr. Gill performed an extensive investigation into Mrs. Munguia's fall, which included reviewing the incident report written by the former manager, the depositions of Defendant's employees, the depositions of Mrs. Munguia and her sister, Ms. Presley, the report of Defendant's expert, Brad Wrong, and measuring the slip resistance of Mrs. Munguia's footwear and the floor tiles:

> Q.   [Plaintiff's counsel] Before we get into more
>      details on what you did and what you concluded,
>      what was the question or the questions that you
>      were looking at when you started off and through
>      your work?

A.    [Dr. Gill] I think the simple big picture question
      is, was – in short, is what I understood you asked
      me to do was to apply my training, experience, and
      expertise to identify the underlying cause or
      causes of Miss Munguia's slip and fall, and that
      was the simple big picture.

      . . .

Q.    [W]e will get into the details, but if we can start
      off with a general description of the work that you
      did, in this case, to address this questions and
      those factors?

A.    Same protocol that I've generally follow.  That is
      your office provided me with material, and I read
      and reviewed that material.  And I don't want to go
      through the entire list, but the ones that were
      most critical was the incident report; then the
      depositions of the various McDonald's employees . .
      . .

           There was a series of documents of McDonald's
      protocol for cleaning, and managing, and
      maintaining the floors, and the standard procedures
      they are to follow.  And to be honest with you, I
      have seen those many times around the country; same
      basic McDonald's documents.

           Then there was the deposition of Miss Munguia,
      obviously, and her sister, Miss Presley was there.
      So I read those depositions.  And then the defense
      hired an expert, whom I know, Mr. Brad Wong, and I
      read his report and deposition.  So, that was the
      key material that I looked at.

           I had the opportunity to literally go out to
      the site and measure the slip resistance of the
      tile.  I had an opportunity to examine Miss
      Munguia's shoes and an exemplar tile; the same tile
      that's on the floor, and actually measure the slip
      resistance of a clean piece of tile with samples
      that I cut off of her shoe and mounted on the
      friction machine.

(Id. at 20-21).

      Based on his investigation, Dr. Gill concluded that

Defendant's employees were not cleaning the floors according to McDonald's standard protocols, resulting in a greasy buildup on the floor that lowered its slip resistance:

> A.   I think there's really three key conclusions or points that I think are important to make. And point number one is very clear, from reading those depositions of the McDonald's employees, they were not following protocol. They were not following what McDonald's set out.
>
>   They were not following what Ms. Rasos had set out. And because they were not following protocol, the floor ends up getting a buildup of grease, and so it lowers the slip resistance of the tile, and the tile is slippery to start with. So that would be point number one.

(Id. at 22).

Dr. Gill explained that he used a device to test the coefficient of friction, a measurement of the slipperiness of a surface, on the floor tiles near where Mrs. Munguia was sitting:

> Q.   And you did this testing at the McDonald's Dairy Road?
>
> A.   Literally as close to the area as anyone knew Miss Munguia slipped . . . that's where I tested first.
>
> Q.   Okay. And can you describe that testing?
>
> A.   . . . The average that I got for four tests was a value of .43; so, significantly below the safe value of .5. I think the thing that was particularly disturbing is it was significantly below what the tile should have been.
>
> Q.   And what – what do you mean what the tile should have been?
>
> A.   The tile, like most things you buy, it comes with its engineering specifications, and it's supposed to be .6, which gives you a little bit of a margin

```
              of safety.  But rather than being .6, I measured
              .43.  Mr. Wong tested three sites.  His averages
              were .41, .41 and .44.  So, we are right there in
              the same numbers, but all the testing is way below
              the .6.
```

(<u>Id.</u> at 30).

Dr. Gill attributed the low slip resistance levels to grease

buildup:

```
     Q.   And what did you attribute your reading; and, I
          guess, Mr. Wong's readings to?

     A.   I think he and I both arrived at the same
          conclusion.  And what it is, is it's a grease film
          buildup that has been occurring on the tile,
          because the tile hasn't been properly cleaned over
          time.
```

(<u>Id.</u> at 30-31).

Dr. Gill also testified about the footwear that Mrs. Munguia

was wearing when she fell, a sandal on her left foot and a medical

boot on her right foot, and whether they could have played a role

in her fall. (<u>Id.</u> at 43-47).  Mrs. Munguia had been suffering from

tendinitis in the days before her fall, and was wearing a special

boot on her right foot designed to alleviate it.  Based on Mrs.

Munguia's description of her fall and an inspection of the boot,

Dr. Gill concluded that the boot did not play a role in her fall:

```
     A.   [Dr. Gill] What I have in my hand is a boot that
          Miss Munguia was wearing on her right foot.  She
          had tendonitis in the days leading up to her
          incident.

     . . .

     Q.   So, the walking boot that you were just holding was
          not on the foot that slipped; correct?
```

A.    That's correct.

Q.    Okay.  And it wasn't – she hadn't taken any steps
      before the fall after getting up from the seat with
      that boot, by your understanding; correct?

A.    That's my understanding.  The boot was on her right
      foot, and the first step that she took was with her
      left foot with the sandal, and that's when the slip
      occurred.

Q.    So, it wasn't the boot that slipped at all?

A.    No, no, not at all.

Q.    And in your looking at it, did it appear to you
      that her wearing the boot contributed to the other
      foot slipping in any way?

A.    Just the opposite of that.  And that is we talked
      about what causes a slip is the heel comes in, and
      it slides out.  If you take a big long stride, then
      the leg is coming in at a shallower angle, like
      this one being tipped back; makes it more likely
      you are going to slip.  When you are walking with
      something like this, if anything, it tends to
      shorten your stride, which means you are going to
      need less friction, not more [in order not to
      slip].

(<u>Id.</u> at 43-47).

Dr. Gill also testified that he did not believe the sandal

that Mrs. Munguia was wearing on her left foot played a causal role

in her slip:

Q.    Now, with regard to the other shoe that was on the
      foot that did slip?

A.    This is the sandal that I understood she was
      wearing.  It's the one that I obviously cut samples
      out of, because it's got two circular holes that
      match up with the pieces.  And it's a soft rubber.
      You can take your fingernail and stick into it, so
      it's a good sole.

> Q. And how did your viewing and looking at the shoe,
> as you did, you got this shoe prior, obviously, to
> testing on it?
>
> A. Well, again, you look at the rubberized sole, and
> you can see it's in excellent condition. It's
> soft. You can stick your fingernail in it. There
> was no question, in my mind, when I saw it, that it
> was not a contributing factor. And then when we
> literally cut the pieces out, tested it on a tile,
> lo and behold we got numbers that are right what
> the manufacturer said we should have gotten. So,
> it's not an issue.

(Id. at 47-48). Defendant presented no evidence at trial to show

that the boot or sandal that Mrs. Munguia was wearing played a

role in her fall, or otherwise controvert Dr. Gill's testimony

that her footwear played no part.

Dr. Gill concluded, based on his inspection of her footwear

and the floor tiles, that Mrs. Munguia would not have slipped in

the manner she described unless there was an additional

contaminant (in addition to grease) on the floor:

> A. Point number two is that I don't think there's any
> question, Mr. Wong agrees and I agreed, that there
> was a contaminant on the floor – nobody knows for
> sure what it is – that further significantly
> lowered the coefficient of friction, which made it
> very dangerous. It was close to rough ice. It was
> that slippery.
>
> . . .
>
> A. [T]here's no question that there had to be a
> contaminant. And again, that's not just my
> opinion. Mr. Wong concluded the same thing in his
> report and his deposition. There had to be
> something else on the floor for this slip to be
> that violent.

(Id. at 22, 40).

29

Dr. Gill's testimony, together with testimony from Mrs. Munguia and Ms. Presley, was sufficient for a reasonable jury to infer that a McDonald's product (or combination of products) on the floor caused Mrs. Munguia to fall. Although the substance she stepped on was not identified, there was evidence that a syrup-like substance was nearby, and evidence that the floor tiles were covered with a grease buildup that would exacerbate the slipperiness caused by a spilled contaminant. Considered as a whole, there was sufficient evidence that Mrs. Munguia's fall was caused by a McDonald's product (or combination of products) that was on the floor as a result of Defendant's self-service mode of operation.

**Testimony from Mr. Kushiyama and Mr. Rosario**

At trial, both the manager of the store, Layne Kushiyama, and the assistant manager, Lubern Rosario, testified that they were working on the day of Mrs. Munguia's accident, and did not see anything on the floor. Their testimony contained contradictions to their deposition testimony, which may have entered into the jury's evaluation of it. Mr. Kushiyama testified that he was brought to the scene shortly after the accident, where he then wrote an incident report:

> Q.   [Plaintiffs' counsel] [Y]ou remember that when you had to come and do that incident report, someone had to come get you from the back office?

> A. [Mr. Kushiyama] I believe I was in the front now that I recall.
>
> . . .
>
> Q. Mr. Kushiyama, do you remember when we took your deposition? . . . [Y]our testimony [at the deposition] was you were in the office; correct?
>
> A. Yes, sir.
>
> Q. Okay. Now, you came out, and you took an incident report; yes?
>
> A. Yes, sir.

(Transcript of Trial, September 29, 2010, at 148 (Doc. 146-148)).

Mr. Kushiyama testified that Ms. Presley pointed out where she believed there was a spot of some substance on the floor, but he did not see anything there:

> Q. [D]o you remember [Ms. Presley] pointing to you – pointing out to you a spot on the floor that seemed to be something that was spilled and not cleaned up?
>
> A. I think so.
>
> Q. Okay. And do you remember, when she told you that, that you acknowledged seeing that on the floor with an "uh-huh" or something like that?
>
> A. I don't remember acknowledging.
>
> Q. Okay. But when she pointed out to you, you saw it; correct?
>
> A. I looked in the area.
>
> Q. Okay. And you saw what she was pointing out to you?
>
> A. I didn't see anything.
>
> . . .

> Q. When she pointed out to you, did you say, "Ma'am, I don't see what you are pointing to; can you be more specific?"
>
> A. No, sir.

(Id. at 149-150).

Mr. Rosario, the assistant manager, also testified that he did not see any substance in the area. (Id. at 178). Although he testified that he did not remember the exact time of day that he examined the floor, he testified that it was in the morning, after Mrs. Munguia and her family members had left:

> Q. [Plaintiffs' counsel] And when [Mr. Kushiyama] brought you out to the floor to look at it, the customers who were involved in the incident were gone; yes? They weren't there?
>
> A. They weren't there anymore. They were gone.
>
> Q. They were gone. Okay. And do you remember what time of the day it was that Mr. Kushiyama asked you to come out and look at the floor?
>
> A. I don't remember anymore. It's in the morning, but I don't remember exactly what the time was.

(Id. at 178-179).

Although Mr. Rosario testified that he looked at the floor in the morning, he also testified that he had previously told a woman investigating the accident that he did not look at the floor until sometime after lunch, rather than early in the morning when the accident occurred:

> Q. Do you remember shortly after the accident, maybe a few weeks later, being interviewed on the phone by a woman who was asking you about the incident?

32

A.    Yes.

Q.    Okay.  And do you remember telling her that you
      thought Mr. Kushiyama brought you out to look at
      the floor after lunchtime?

A.    I don't remember.

. . .

Q.    You told the woman on the phone, shortly after the
      incident, that Mr. Kushiyama had brought you out to
      look at the floor shortly after lunch; correct?

A.    Yes,    based    on    this    [record    refreshing
      recollection], yes.

(Id. at 179-181).

Although Mr. Kushiyama and Mr. Rosario testified that they
did not see a substance, Dr. Gill testified that whatever
contaminant was on the floor may have been scarcely visible or
wholly invisible both before and after Mrs. Munguia's fall.  Dr.
Gill explained that when one's foot slides over something, is
spreads it out and disburses it, and that if it is a liquid, it
may evaporate or be absorbed by clothes:

A.    When your foot slides on something, it spreads it
      out, it thins it out, it disburses it.  If it's a
      clear liquid or any kind of liquid, it's going to
      evaporate quicker.  The clothes will absorb it.

(Transcript of Trial, September 30, 2010, at 41 (Doc. 157)).

Dr. Gill also testified that the low coefficient of friction
levels on the tiles near where Mrs. Munguia fell was likely a
result of grease buildup, which would not be visible to a person
walking by:

> A. You really don't see the grease buildup. . . .
> [W]ith a value of .4, you can't see it. You can
> feel it, if you try.

(Id. at 35-36). He further testified that it is not uncommon,

from his experience, for floor contaminants to not be visible:

> Q. [Plaintiffs' counsel] Now, if no one saw anything,
> the remnants of the grease on that floor, you have
> indicated that it could have evaporated, or it
> could have been wiped off on your clothes; is that
> right?
>
> A. There's a number of things. Grease won't evaporate
> . . . . Grease will get spread out . . . . You
> fall typically. You imagine your foot going out
> and you fall, and you land right where you slipped.
> And so your clothing typically will absorb anything
> that's there. It gets spread out to where it's
> harder to see. People are moving around in the
> area. It's not uncommon, from my experience, to
> not see the contaminant.

(Id. at 60-61).

A reasonable jury could infer from Dr. Gill's testimony that

Mrs. Munguia slipped on a substance that was not visible, or no

longer visible, by the time Mr. Kushiyama and Mr. Rosario viewed

the floor. Although the Court does not make credibility

determinations when reviewing a motion for judgment as a matter of

law, the Court also notes that there were numerous inconsistencies

between Mr. Kushiyama's and Mr. Rosario's testimony at trial and

their testimony in their pre-trial depositions. A reasonable jury

could have found the evidence that there was a substance on the

floor (including the testimony of Mrs. Munguia, Ms. Presley, and

Dr. Gill) more credible than Mr. Kushiyama's and Mr. Rosario's

testimony.

**Plaintiffs Did Not Need To Identify the Precise Substance**

Defendant argues that there was no evidence that the slippery substance that caused Mrs. Munguia to fall resulted from Defendant's mode of operation because Plaintiffs failed to identify it.  Defendant notes that Mrs. Munguia testified that she did not know what substance was on the floor.  Defendant acknowledges that Rebecca Presley, Mrs. Munguia's sister, testified that she saw a spot of a syrup-like substance with black dots, but Defendant claims it does not sell any items matching that description.  Because the substance was unidentified, Defendant argues, there was no evidence that it came from the restaurant or resulted from any mode of operation utilized by Defendant.

Defendant cites no authority that supports its position that Plaintiffs were required to identify the precise substance that caused Mrs. Munguia to fall in order for a jury to find Defendant liable under the mode of operation rule.  Plaintiffs may prove that the substance was derived from Defendant's restaurant operation through circumstantial evidence, without needing to directly identify it. See Bunhichi v. Honolulu Rapid Trans. & Land Co., 18 Haw. 475, 481 (1907).  The evidence includes the failure to have sufficient staff examining the floor for spills during the

busy times of the restaurant's operation. As several courts have ruled, circumstantial evidence that a hazard was created by a defendant's negligence can be sufficient for a jury to find liability, even though the precise nature of the hazard has not been identified. See, e.g., Fobbs v. Webb Bldg. Ltd. Partnership, 349 S.E.2d 355, 358 (Va. 1986) (Plaintiff's negligence claim did not fail merely because she "could not say what caused her to fall."); Wesley v. McAlpin Co., 1994 WL 201825, at *4 (Ohio Ct. App. 1994) (Plaintiff's failure to describe what caused her to fall did not per se preclude her negligence claim); Gulf Hills Dude Ranch, Inc. v. Brinson, 191 So.2d 856, 860 (Miss. 1966) ("[I]t was not necessary . . . [for plaintiff] to show the substance which was on the floor which caused him to slip.") Defendant cites no authority establishing a heightened burden of proof in mode of operation cases, such that Plaintiffs would be required to prove the precise nature of the hazard.

As outlined above, there was sufficient circumstantial evidence that Mrs. Munguia slipped on a substance on the floor of Defendant's restaurant, including Ms. Presley's testimony that she saw a substance that looked like syrup, and Dr. Gill's testimony that the floors had a grease build up, but had to have an additional substance to cause her to slip and fall. There was evidence, moreover, that whatever contaminant was on the floor may not have been visible after the fall, making its identification

potentially impossible.  A reasonable jury could have concluded, based all the evidence presented at trial taken as a whole, including the testimony of Mrs. Munguia, Ms. Presley, and Dr. Gill outlined above, that Mrs. Munguia slipped on syrup, grease, or some other product or combination of products derived from Defendant's restaurant and mode of operation.

**Mrs. Munguia Was Seen Lying On Her Stomach After Her Fall**

Defendant argues that because Mrs. Munguia was seen lying on her stomach after her fall, it would have been physically impossible for her to have had her left foot slide out from under her and fall onto her buttocks, as she described.

The Defendant's theory is that it is not possible for Mrs. Munguia to have slipped, fallen on her buttocks and turned onto her stomach.  Mrs. Munguia's testimony was that after she landed on her buttocks, she rolled over onto her stomach because of the pain:

> A.   [A]s I'm going down, I'm going down so fast, I immediately landed in that space where that table and that pillar are at.  Landed on my buttocks sort of an Indian-style, because it's a very confined area.  And I was kind of squashed in that area.
>
>     And as soon as I landed, when I slipped, my bottom hit that floor, and I hear this whooshing sound and a snap-like sound, and I had this excruciating pain in my back.  And I realized that I was hurt very badly.
>
> Q.   [Plaintiffs' counsel] And what happened next?

> A. I was crying from the pain. About this time, my sister, I believe, realized what had happened. I – and Mila is "Aunty Bev is hurt." I hear Becky telling something to Ruben I was hurt. It was also surreal at that particular moment.
>
> Q. When you heard these voices, were you still sitting Indian-style on your buttocks between the table?
>
> A. At this particular time, Mr. Cruise, I had landed, like I said, when I slipped and fell on my buttocks. I had rolled over, because of the pain, onto my stomach, in this very confined area because I could not move. I rolled onto my stomach in this area.
>
> . . .
>
> Q. And do you remember how you went from landing on your buttocks to having your head out towards the aisleway?
>
> A. I have – I have no idea how I landed in that position, other than, as I said, when I landed – when I slipped, and I fell, and I landed flat on my buttocks, the pain was so bad, in my back, I rolled. I can – I recall rolling and somehow winding up – I got on my stomach, flat on my stomach, and that's how I wound up in that particular position. Because of the impact on my buttocks, I rolled to my stomach.

(Transcript of Trial, October 4, 2010, at 13-14 (Doc. 159)). Mrs. Munguia's description of her fall was supported by the testimony of her treating neurosurgeon, Dr. Timothy Hopkins. He testified that she suffered a L-1 vertebra fracture consistent with having fallen on her buttocks. (Transcript of Dr. Timothy Hopkins's video-taped deposition, entered into evidence at trial, at 45 (Doc. 89-1)).

No witnesses at trial testified to seeing Mrs. Munguia fall.

There was testimony that she was observed lying on her stomach *after* her fall. The testimony is consistent with her testimony that she rolled onto her stomach. There was no testimony that contradicted Mrs. Munguia's description of her fall. The theory of the Defendant is not sufficient to warrant rejecting the decision of the jury.

**Conclusion**

There was sufficient evidence to support the second of the three basic elements necessary for a finding of liability for negligence under the mode of operation rule. Although Mr. Kushiyama and Mr. Rosario testified that they did not see a substance on the floor after the fall, a reasonable jury could have concluded that the evidence on the whole showed that Mrs. Munguia fell on a slippery substance derived from Defendant's restaurant. Based on the evidence, including testimony from Mrs. Munguia, Ms. Presley, Dr. Hopkins, and Dr. Gill, a reasonable jury could conclude that a product derived from Defendant's restaurant caused Mrs. Munguia to fall.

Plaintiffs did not need to identify the precise substance that caused Mrs. Munguia to fall because there was sufficient circumstantial evidence that it was derived from Defendant's restaurant. See Bunhichi v. Honolulu Rapid Trans. & Land Co., 18 Haw. 475, 481 (1907) (inferences may be made from circumstantial

evidence).  Mrs. Munguia's testimony about her fall onto her
buttocks and roll onto her stomach is supported by testimony from
Dr. Hopkins, her spine surgeon, and Dr. Gill.  There is
substantial evidence to support the jury's verdict. See <u>Maynard v.
City of San Jose</u>, 37 F.2d 706, 709 (9th Cir. 1992).

### 3. Evidence That Defendant Failed To Take Reasonable Action To Discover And Remove The Dangerous Condition

Finally, to establish the third of the three basic elements
necessary for a finding of liability for negligence under the mode
of operation rule, Plaintiffs were required to present evidence
that Defendant failed to take reasonable action to discover and
remove (or otherwise correct) the dangerous condition.  There was
sufficient evidence for a reasonable jury to find that Defendant
failed to take reasonable action to discover and remove the
dangerous condition that caused Mrs. Munguia to fall.  There was
strong evidence that the McDonald's Corporation's cleaning
procedures and floor safety rules were not followed at Defendant's
restaurant.  Such evidence included testimony from Defendant's
employees: Lea Rasos, the Operations Manager, Layne Kushiyama, the
manager, Clifford Villahermosa, Eric Derige, and Lubern Rosario,
the assistant manager.  Additional evidence came from testimony
from Plaintiffs' expert witness, Dr. Richard Gill.

**Testimony from Ms. Rasos**

Ms. Rasos testified that the McDonald's Corporation provides franchisees with manuals that contain rules for how the floors should be cleaned. (Transcript of Trial, September 29, 2010, at 75 (Doc. 148)). She explained that McDonald's has a specific and detailed protocol of steps that must be followed to ensure a clean and safe floor.

According to Ms. Rasos, several of McDonald's floor cleaning rules were not followed at Defendant's restaurant. Ms. Rasos testified that among such rules is a requirement that a "lot and lobby" person monitor the dining room and make sure the floors are clean throughout the day. On the day of Mrs. Munguia's fall, there was no lot and lobby person scheduled to work at Defendant's McDonald's:

> Q.   [Plaintiffs' counsel] [T]ell me what a lot and lobby person is?
>
> A.   [Ms. Rasos] A lot and lobby person would be the person that would be in charge of – would be responsible for keeping the dining room clean, and restocked, and make sure the trashcans are full – not full . . . . Their responsibility is to make sure the dining room is ready for the customers.
>
> Q.   And during most of the day, where the lot and lobby person is supposed to be, is in the lobby; correct, in the dining room?
>
> A.   Most of the time, yes, sir.
>
> Q.   Okay. And the specific purpose of having the lot and lobby person, in the dining room, is to be able to attend to those spills and mishaps that happen throughout the day; correct?

A.    Yes, sir.

Q.    Okay.  If you don't have a lot and lobby person, in
      the lobby, in the dining room, you expect that
      there will be things spilled that will not be
      getting cleaned up in the way that they should be;
      correct?

A.    Yes.

Q.    Okay.  And if you have the greasy film underneath,
      then that's even further reason for concern; yes?

A.    Yes, sir.

Q.    Okay.  And on the morning that Mrs. Munguia was
      injured, there was no lot and lobby person on your
      schedule; correct?

A.    I believe there's – if I could look at the schedule
      again.

. . .

Q.    [T]here was not a lot and lobby person scheduled to
      work this day; correct?

A.    No.

Q.    Okay.  Now, there was a maintenance person
      scheduled to work this day; yes?

A.    Yes, sir.

Q.    Okay.  Now, maintenance and lot and lobby position,
      they are different positions; yes?

A.    Yes, sir.

(Id. at 42-45).

    Ms. Rasos testified about a series of other rules that were

not followed.  She testified that the crew members would not damp

mop the dining room floor five times a day, only scrubbed the

floors once a week rather than daily, were not instructed to allow

the cleaning solution to soak into the floor for 3-5 minutes for the evening mopping, did not use a hi-low brush to scrub the floors, and were not instructed to mop at closing time with a liberally wet mop:

> Q.  [Plaintiffs' counsel] [T]his is one of the [McDonald's training] manuals that you get that tells you what rules to follow to keep the floors clean; yes?
>
> A.  Yes.
>
> . . .
>
> Q.  The bottom right [in the manual] are the beginning of some rules on how to keep the floors clean; correct?
>
> A.  Yes, sir.
>
> . . .
>
> Q.  And after it says, "sweep floor", it says, "Thoroughly wet the floor using the FloorCare"; correct?
>
> A.  Yes.
>
> Q.  And this is part of the mopping process?
>
> A.  Yes.
>
> Q.  And it says there to wait three to five minutes --
>
> A.  Yes.
>
> Q.  – before proceeding; yes?
>
> A.  Yes.
>
> Q.  And that's to allow the solution to begin to work on the grease on the floor?
>
> A.  I believe so, yes.

Q.   Okay.  Now, that's not part of the instructions
     that you give to your crew to follow; correct?

A.   No.

Q.   Okay.  And after that, it says, "Use a hi-lo deck
     brush to scrub."  Do you see that?

A.   Yes.

Q.   And in terms of daily maintenance, which this
     manual is talking about, that's not something that
     you did either; correct?

A.   Yes.

.  .  .

Q.   And on the top right-hand column is a checklist;
     yes?

A.   Yes.

Q.   Okay.   And that's a checklist of the daily
     maintenance that should be done according to
     McDonald's recommendations in the dining room; yes?

A.   Yes, sir.

Q.   Okay.  And presumably, the purpose of a checklist
     is that when those tasks are done, somebody can
     check it off; yes?

A.   Yes.

Q.   Okay.  And the last box there to be checked off is
     to indicate that the floor is swept; yes?

A.   Yes.

A.   And that the floors are scrubbed?

A.   Yes.

Q.   And this isn't done; correct?

A.   Yes.

Q.   And a checklist like this – you don't use a
     checklist like that at [Defendant's McDonald's];
     correct?

A.   No, we don't.

. . .

Q.   Now, in addition to this training SOC [Station
     Observation Checklist] manual that you get from
     McDonald's, you also get an operations manual; yes?

A.   OMC manual [Operations and Training Manual], yes.

. . .

Q.   This manual also sets forth rules that McDonald's
     tells owners should be done to keep the floor
     clean; correct?

A.   Yes.

. . .

Q.   And . . . it says that the floors should be damp
     mopped five times a day at least; correct?

A.   Yes.

. . .

Q.   And so [Defendant's McDonald's] doesn't damp mop
     the dining room floor five times a day; correct?

A.   The whole floor, no, sir.

. . .

Q.   Okay.  And a couple paragraphs down . . . it says
     to mop at close with a liberally wet mop; correct?

A.   Yes.

Q.   And that's not an instruction that you give to the
     crew at [Defendant's McDonald's]; correct?

A.   No.

(Transcript of Trial, September 29, 2010, at 69-77 (Doc. 148)).

Ms. Rasos also testified that the manager, Mr. Kushiyama, did not take a photograph of the scene of the accident, per McDonald's protocol:

> Q.  Now, you have rules also for how managers are to take incident reports when somebody is injured; correct?
>
> A.  Yes, sir.
>
> Q.  Okay.  And among those rules is that the manager, if somebody reports a slip and fall, is supposed to take photographs of the conditions of the floor when it's reported?
>
> A.  Yes, sir.
>
> . . .
>
> Q.  And you have a camera?
>
> A.  We do keep a camera.
>
> Q.  Specifically for that purpose?
>
> A.  Yes.
>
> Q.  And the mangers are instructed to use that camera to take pictures when they do an incident report like that; yes?
>
> A.  Yes, sir.
>
> . . .
>
> Q.  Mr. Kushiyama did not take pictures; correct?
>
> A.  Yes, he said he did not.

(Id. to 83).

In summary, Ms. Rasos testified that Defendant failed to follow the McDonald's Corporation's cleaning instruction and

operation manuals. For example, the restaurant did not have a lot and lobby employee monitoring the floors on the day of Mrs. Munguia's fall, habitually did not follow a number of the cleaning protocols, and did not photograph the floor after the accident.

## Testimony from other Employees

Several other of Defendant's employees substantiated Ms. Rasos's testimony that the McDonald's Corporation's recommended floor cleaning procedures were not being followed.

## Layne Kushiyama, the Manager

Layne Kushiyama was a manager at the McDonald's where Mrs. Munguia was injured, and was on-duty on the day of her fall. Mr. Kushiyama testified that the manager is normally required to perform a "travel path" at least once every 30 minutes to check the dining room floors and other areas for any safety concerns or other problems, and once every 15 minutes during high traffic hours:

> Q.   [Plaintiffs' counsel] [A]s a manager, you have a duty do to travel paths every half hour or every 15 minutes during your job; yes?
>
> A.   Yes, sir.
>
> Q.   Okay.  And the travel path is where you come out from behind the counter, and you walk around the dining room, check on the customers, check on the – you look at the floor, see if there's anything there, and just generally scope things out?

A.    Yes Sir.

Q.    Okay.  And the purpose of travel paths, among other
      purposes,  like  maybe  customer  relations,  is
      customer safety?

A.    Yes, sir.

. . .

Q.    The  safety  aspect  is  checking  to  make  sure  the
      floor is not dirty?

A.    Yes, sir.

(Transcript of Trial, September 29, 2010 at 144-145 (Doc. 148)).

McDonald's recommends that a timer be used to remind the

manager of this duty.  Mr. Kushiyama testified that he had a timer

behind the counter for this purpose, but that he did not use it,

or make any record to show he performed the travel paths:

Q.    And when you were the manager, you remembered to do
      travel paths by memory; correct?

A.    Yes, sir.

Q.    Okay.  You didn't use the timer that was behind the
      counter, because you could remember; correct?

A.    Yes, because it was part of my daily duties, so I
      felt I didn't need the timer.

Q     So, you didn't need the timer.

A.    (Shakes head.)

Q.    Okay.  And you didn't use an initial or sign-in
      sheet to record that you had done travel paths;
      correct?

A.    No.

(Id. at 145).

Mr. Kushiyama further testified that during the rush "lockdown" hours (breakfast, lunch, and dinner times), a manager was required to be located either at the counter or doing travel paths. (Day 2 at 146). At trial, Mr. Kushiyama gave conflicting and somewhat ambiguous testimony about where he was located at the time of Mrs. Munguia's fall. He first testified that he was at the counter, but then stated that he may have gone into the office to get something, he didn't remember. He admitted, however, that at a previous deposition he had testified that he was in the office when Mrs. Munguia fell, and that an employee who saw the accident also stated that he was in the office at the time:

Q. Are you familiar with the term lockdown?

A. Yes, sir.

Q. Okay. And lockdown is during . . . breakfast, lunch, and dinner times?

A. Yes, sir.

Q. Okay. And what does lockdown mean?

A. Everyone would be in their positions during that certain time.

Q. Okay. And for the front-end manager, that means out on the counter or out doing travel paths?

A. Yes, sir.

Q. Okay. Out in the front of the store?

A. Yes, sir.

Q. Okay. Now, you remember taking an incident report with respect to Mrs. Munguia's injury?

A.    Yes, sir.

Q.    Okay.  And you remember that when you had to come
      and do that incident report, someone had to come
      get you from the back office?

A.    I believe I was in the front now that I recall.

. . .

Q.    Do you remember having your deposition taken in
      this case?

A.    Yes, sir.

. . .

Q.    And when I asked you [at the deposition] where you
      were, when you learned of the incident, you
      testified that you were in the office; correct?
      And . . . if you need to look at the deposition .
      . . .  The question was: "Where were you when this
      crew member told you that someone needed to see a
      manager?  And your answer was, "I believe I was in
      the office."

A.    I said that, but I – being that it was lockdown
      hours, that I recall now, I – I was supposed to be
      up front.

Q.    But you don't remember if you were up front?

A.    I should have been up front.

Q.    You should have been up front?

A.    Yes, sir.

Q.    Okay.  But your testimony was you were in the
      office; correct?

A.    Yes, sir.

(Id. at 147-148).

**Clifford Villahermosa**, **Closing Shift**

Clifford Villahermosa, an employee who performed closing shift moppings during the period when Mrs. Munguia fell, testified that he did not follow all of McDonald's recommended cleaning procedures.  The McDonald's manual directed a full bucket of water to be used, in order to obtain the proper ratio of soap to water. Mr. Villahermoas testified that he did not follow this rule:

> Q.    [Plaintiffs' counsel] When you mopped the floor, at the close of business, you would use just a half a bucket of water to mop the dining room; correct?
>
> A.    [Mr. Villahermosa] Yeah.
>
> Q.    Was that your regular practice?
>
> A.    Yes.

(Id. at 128).

The McDonald's manual also warned that the water must be changed as soon as it gets dirty, in order to avoid a counterproductive spreading of grease back on the floor.  Mr. Villahermosa gave ambiguous testimony at trial as to whether he followed this rule, and appeared to contradict his previous deposition testimony:

> Q.    And from the time that you started to mop the dining room floor to the time you finished, you would use that same half bucket of water; you wouldn't change it; correct?
>
> A.    I change it.
>
> Q.    You would change it?
>
> A.    Yeah.

Q.    Okay.  How many times would you change it?

A.    Maybe one, two.

Q.    Maybe or --

A.    It was all depends is like all dirty, yeah.

.  .  .

Q.    Okay.  Do you have your deposition in front of you?

A.    Yes.

.  .  .

Q.    Now, do you remember me asking you, in your
      deposition, about how often you would change the
      water when you mopped the floor?  Do you remember
      that we talked about that in your deposition?

A.    I don't remember.

Q.    Okay.  Well, starting on Page 13 – actually, you
      should probably start on the last line of Page 12.
      There's a question that says: "When do you change
      the water in the bucket?"  Do you see that?

A.    Page 12?

Q.    The last line of Page 12, yeah.

A.    Okay.

.  .  .

Q.    Let's go back .  .  .  .  And I will start reading
      [your deposition].  "And in the course of mopping
      the dining room floor, do you change the water in
      the bucket?" was the question.  The answer, "Yeah,
      you have to change, because it's all dirty, yeah."
      Question: "Okay.  When do you change the water in
      the bucket?"  The Answer: "Every night, like after
      – before I mop, and then after I mop, I drain the
      water."  The following question: "Okay.  During the
      course of mopping the floor, do you change the
      water in the bucket or just after you are done?"
      The answer: "After I'm done."   The following

question: "So, okay. So, to mop the floor, you use
just one bucket?" And the answer was, "Yeah." Did
I read that correctly?

A.    Yeah.

(Id. at 128-131).


**Eric Derige**

Another employee, Eric Derige, gave similarly ambiguous
testimony at trial regarding whether or not he would regularly
change the mopping water as soon as it became dirty:

Q.    [Plaintiffs' counsel] [I]n your description of how
      you would mop the floor . . . you would, as you
      describe it, use two – two buckets of water; you
      would mop, and then if you needed – the floor was
      still wet, then you would mop it to dry it;
      correct?

A.    [Eric Derige] Yeah, re-mop it again.

Q.    Okay. And when you did the first mopping, isn't it
      correct that you wouldn't change the water during
      that mopping process? You would change it before
      you did the dry mopping; is that right?

A.    Well, the first mopping, if you see the floor is
      still wet, then we have to try to re-mop it.

. . .

Q.    Okay. And that is when you would change the water
      in the bucket if you had to do the dry mopping?

A.    Well, the first mopping that we do is when you see
      the water gets dirty, then I have to change the
      water again.

Q.    Do you remember when I asked you some questions
      over on Maui in your deposition maybe about a year
      ago?

> A.   (Nods head.)
>
> . . .
>
> Q.   [D]oes that refresh your recollection as to having
>      told me, in your deposition, that you changed the
>      water when you were done with the first bucket?
>
> A.   Correct.

(Transcript of Trial, October 5, 2010, at 105-106 (Doc. 160)).  He also confirmed that the floors were only being scrubbed once a day:

> Q.   Now, so you did the scrubbing on Fridays in the
>      dining room?
>
> A.   Yes.
>
> Q.   But other days in the dining room, you did not; you
>      just mopped; correct?
>
> A.   Yeah, we just mopped on Saturday.

(<u>Id.</u> at 104).


**Lubern Rosario, Assistant Manager**

Further evidence showing Defendant failed to take reasonable steps to keep its floors clean during the period of time when Mrs. Munguia's fell, came from the testimony of the assistant manager, Lubern Rosario.  Mr. Rosario testified that when he would leave his shift at around 3:00 pm, he would sometimes leave notes on the bottom of the schedule for the afternoon crew.  (Transcript of Trial, September 29, 2010, at 182 (Doc. 148)).  On the Day of Mrs.

Munguia's fall, Mr. Rosario left a note instructing the afternoon crew to please clean the floor better. (<u>Id.</u> at 183). This instruction suggests that Mr. Rosario may have believed that Mrs. Munguia's fall was related to a failure to properly clean the floors.

**Testimony from Richard Gill**

Plaintiff's expert witness, Dr. Richard Gill, a safety and mechanical engineer, performed an extensive investigation of Mrs. Munguia's accident. He testified that he was very familiar with McDonald's floor cleaning protocols, and that it was "very clear, from reading the depositions of the McDonald's employees, [that] they were not following protocol." (Transcript of Trial, September 30, 2010, at 22 (Doc. 157)). "[B]ecause they were not following that protocol," Dr. Gill concluded, "the floor ends up getting a buildup of grease," lowering its "slip resistance." (<u>Id.</u> at 22).

Dr. Gill explained how a practice known as "slop mopping," which he believed was used at Defendant's McDonald's, creates a dangerous buildup of a grease on floors:

Q.     [Plaintiffs counsel] You had mentioned this process of the buildup of the grease on the floor. Can you explain that phenomenon in a little more detail?

A.     [Dr. Gill] Sure. What happens is – and I think all of us have had this experience. Oils, greases, and fats, they don't mix or dissolve in water. They form a film, and they are separate. So, how do you get oils, grease, and fats cleaned up off your floor?

You put detergent or soap in your water, and that makes the oils, grease, and fats dissolvable within water, which is all well and good. So, we take our mop, and we get a little soapy water on it, and we put it on the floor, and we scrub it around, and we dissolve the grease, and it starts to soak up in our mop.

But what do we do with it then? We take that mop, with the suspended greases and oils, and we put it back in our soapy water, we ring it out, and we slop it back on the floor.

Now, when you continue to do that – not in our homes, because we don't have that much buildup. But in a fast food restaurant, with people in and out, and all the cooking and all the spills, over time, what happens, is you start spreading this thin film of suspended greases and oils from your soap and water bucket back onto the floor.

Now, when the water evaporates, what have you left behind? A polymerized film of grease and oil. And over time, that builds up.

Now, it goes by some names. A slang name used in the safety profession is slop mopping. That's not critical of somebody is not doing their job. It's a function of if you use a bucket of water and soap and a mop, and you keep using the same one in a floor, by the end of the day, when you get to the end of the floor, you have taken the concentrated areas of grease, you have picked a lot of them up, but you have also spread a thin film on the floor. And over time, that builds up to create a dangerous condition.

(Id. at 22-24).

As discussed above, there was evidence that slop mopping was practiced at Defendant's restaurant. Dr. Gill testified that he believed this practice, and the failure to follow McDonald's cleaning protocols generally, resulted in a floor with an unsafe level of grease buildup:

Q.   [O]ther than the testing that you did and that Mr.
     Wong did [showing the floor tiles had a slip
     resistance reading of .42] . . . was this any other
     evidence that you considered, in forming your
     opinion that the lower reading of the tile, at the
     store, was due to this slop mopping or the
     polymerized-to-grease phenomenon you are talking
     about?

A.   Yes, I think that's then consistent with all the
     testimony from Miss Rasos all the way down.  And
     that is, on the one hand, they are saying
     McDonald's has this very precise floor safety risk
     management plan that we are supposed to follow.
     That's what makes our floors safe.  But then they
     don't follow it.

          And they don't even follow their own version
     of that plan, such as, well, okay.  We got to do
     travel paths, and we got to do those every 30
     minutes.  And we know people can't remember that
     well, so we will have a little alarm clock.  When
     it goes off, you do your travel path.  If it's
     busy, we need you to do it every 15 minutes.

          The store manager, Mr. Kushiyama, says, no, I
     didn't do that.  I just did my best to remember.
     McDonald's says you need to document it.  You know,
     let's face it.  We are all busy.  We all get caught
     up in things.  As well intended as we may be, we
     need a kick in the rear end, so to speak, now and
     then.  You got to have accountability.

          . . .

          It's just accountability.  It's just a way to
     make sure people are doing their job.  And those
     things weren't being done.  And lo and behold, by
     not doing those, not doing the moppings five times
     a day, not doing the nightly scrub, in fact, not
     even doing it weekly, like Miss Rasos wanted, Mr.
     Kushiyama says, well, yeah, we probably did it
     every other week.   That's every 14 days.
     McDonald's says every night.

(Id. at 33-35).

     Dr. Gill summarized the practices at Defendant's McDonald's

that he believed contributed to the floor's condition:

Q. And when you were working on this case, did you, in addition to the looking at the chronic mopping practices or lack there of the defendant, did you look at their conduct; how they followed their safety rules or didn't on the morning that Mr. and Mrs. Munguia and Miss Presley were at the store?

A. Yes. We have the preceding history of not doing the mops five times a day, not doing the nightly deep cleaning, scrubbing. We have those issues. We have the issues with not doing the travel paths.

And then what we have is we have Miss Rasos saying, boy, one our front line defenses, in real time, is our lot and lobby person. They are to be assigned to the dining room full-time. That's all they are to do is to clean up spills and look for spills. Because we know if customers drop something and pick it up, they are not going to get the bucket and mop out. They might take a napkin and wipe it, but they are not going to do a good job of cleaning it.

There wasn't a lot and lobby person. None was assigned to that day. Now, there was a maintenance person, but even that person wasn't in the lot and lobby. They were out in the parking lot. So, literally just before the slip and fall, we see this chronic history of not following the rules is continuing on.

And it's the culmination of all these things, as is typical of a case, that ultimately leads to an accident. It's not one thing. It's all of them combined.

Q. And Mr. Kushiyama's manner of doing or not doing travel paths that morning, was that something that you considered?

A. Yes. Again, Mr. Wong and I are on the same page. Given the description of the fall, given what he and I measured, there had to have been another contaminant on the floor besides the polymerized film buildup.

If you have a lot and lobby person or somebody
doing the travel path when they are supposed to,
then that type of contaminant can be spotted and
cleaned up before you have a slip and fall.

(Id. at 39).


**Conclusion**

There was sufficient evidence to support the third of the three
basic elements necessary for a finding of liability for negligence
under the mode of operation rule. There was sufficient evidence
for a reasonable jury to find that Defendant's negligence caused
a slippery substance to be on the floor, causing Mrs. Munguia's
fall.  A jury verdict need only be supported by evidence that
"reasonable minds might accept as adequate to support a conclusion
even if it is possible to draw two inconsistent conclusions from
[it]." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir.
1992); see also E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951,
961 (9th Cir. 2009) (the court may direct judgment as a matter of
law only if "the evidence permits only one reasonable conclusion,
and that conclusion is contrary to the jury's verdict."  Evidence
from numerous sources reflected that McDonald's cleaning
procedures and rules for ensuring that dining room walkways are
safe were not followed at Defendant's restaurant.

There was sufficient evidence at trial to support each of the
necessary elements of a finding of liability for negligence under
the mode of operation rule.  There was sufficient evidence that:

(1) Defendant utilized a mode of operation with a reasonably foreseeable dangerous condition; (2) Defendant's mode of operation resulted in a dangerous condition (a slippery floor) that caused Mrs. Munguia to be injured; and (3) Defendant failed to take reasonable action to discover and remove the dangerous condition. Because Plaintiffs provided sufficient evidence to support each of the necessary elements of their claim that Defendant is liable for negligence under the mode of operation rule, Defendant's renewed Motion for Judgment as a Matter of Law is **DENIED.**

## II. Alternative Motion for New Trial or for Remittitur

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 50(b) allows a party filing a renewed motion for judgment as a matter of law to include an alternative request for a new trial under Rule 59. Rule 59 allows the court to grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Although Rule 59 does not specify the grounds on which a court may order a new trial, historically recognized grounds include: "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Passantino v. Johnson & Johnson Consumer

<u>Prods.</u>, 212 F.3d 493, 510 n. 15 (9th Cir. 2000)). "When a motion for a new trial is based on insufficiency of the evidence, a 'stringent standard applies' and a new trial may be granted 'only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result.'" <u>MLM Property, LLC v. Country Cas. Ins. Co.</u> 2010 WL 1948609, at * 2 (D. Or. 2010) (quoting <u>Digidyne Corp. v. Data Gen. Corp.</u>, 734 F.2d 1336, 1347 (9th Cir. 1984)).

If the Court finds that defendant is entitled to a new trial on the ground that the jury's damages award is excessive, the Court may offer the plaintiff the choice of accepting a remittitur (a reduction) of the award in lieu of a new trial. <u>See Funai Elec. Co., Ltd. v. Daewoo Electronics Corp.</u>, 593 F.Supp.2d 1088, 1093 (N.D. Cal. 2009). A jury's damages award is generally "entitled to great deference," and "should be upheld unless it is clearly not supported by the evidence or only based on speculation or guesswork." <u>In re First Alliance Mortg. Co.</u>, 471 F.3d 977, 1001 (9th Cir. 2006); <u>see also Del Monte Dunes at Monterey, Ltd. v. Monterey</u> 95 F.3d 1422, 1435 (9th Cir. 1996) (A jury's damages verdict must be upheld unless it is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guess work.") The Court must uphold a damages verdict "whenever possible, and all presumptions are in favor of the judgment." <u>DSPT Intern., Inc. v. Nahum</u>, 624 F.3d 1213, 1224

(9th Cir. 2010) (quoting <u>Bouman v. Block</u>, 940 F.2d 1211, 1234 (9th Cir. 1991).

**ANALYSIS**

Defendant moves, in the alternative, for a new trial or remittitur on the grounds that: (1) the jury was improperly instructed on the "mode of operation" rule; (2) the verdict is contrary to the clear weight of the evidence; and (3) the damages award is excessive.

**A.  The "Mode of Operation" Jury Instruction Was Proper**

Hawaii Standard Civil Jury Instruction No. 17.4, which the Court gave over Defendant's objection, incorporates the mode of operation rule.  The instruction provided by the Court, and based on the model instruction, states:

> A business has a duty to exercise reasonable care to maintain its premises in a safe condition and remove unreasonable risks of harm that arise from the way in which a business is conducted or operates.
>
> To prevail on their claims, Plaintiffs must prove all of the following elements:
>
> 1.  A Condition in the building posed an unreasonable risk of harm; and
>
> 2.  Defendant failed to take reasonable steps to remove the unreasonable risk of harm or to give adequate warning of that risk; and
>
> 3.  Defendant's failure was a legal cause of injury to Plaintiffs.

(Jury Instructions at No. 21, (Doc. 145)).

Defendant argues that it was improper for the Court to provide this instruction based solely on Defendant's fast-food, "self-service" method. Defendant raised an identical argument in support of its Renewed Motion for Judgment as a Matter of Law. As discussed above, Defendant's contention that a fast-food, "self-service" method cannot constitute a "mode of operation" for purposes of applying the mode of operation rule of liability, is firmly contrary to Hawaii law. See Gump, 5 P.3d 407; Moyle, 191 P.3d 1062. The "mode of operation" rules applies to Defendant's "self-service" method, and sufficient evidence was presented for the jury to find Defendant liable under the rule. The jury instruction incorporating the rule was proper.

## B.   The Verdict Is Not Against The Clear Weight Of The Evidence

Defendant argues that it is entitled to a new trial because the jury's verdict is against the clear weight of the evidence. This argument is duplicative of Defendant's argument, made in support of its Renewed Motion for Judgment as a Matter of Law, that Plaintiffs failed to present sufficient evidence to support a jury finding of liability under the mode of operation rule.

As discussed above, Plaintiffs presented sufficient evidence for the jury to reasonably find Defendant liable. Plaintiffs presented evidence that Defendant utilized a self-service mode of

operation involving a reasonably foreseeable risk of greasy buildup on floors and of falling food, failed to take reasonable action to prevent that risk, and that failure caused Mrs. Munguia to fall. The clear weight of the evidence was not against the jury verdict.

### C. Defendant Is Not Entitled To Remmittitur On The Ground That The Damages Award Is Excessive

Plaintiff Beverly Munguia was awarded $2,670,227.55 in special damages and $3,000,000 in general damages, for a total damages award of $5,670,227.55. Defendant argues that the damages award is excessive and should be remitted. Defendant contends that the jury's compassion for Mrs. Munguia's circumstances colored their assessment of liability and damages, but does not explain how the damages award is excessive.

A jury's finding on the amount of damages will be upheld unless the amount is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guess work." Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996); see also Brady v. Gebbie, 859 F.3d 1543, 1557 (9th Cir. 1988) (Damages award must be upheld unless it is "shocking to the conscience."). A party "seeking remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit

it to stand." <u>Currier v. United Technologies Corp.</u>, 393 F.3d 246, 256 (1st Cir. 2004) (internal quotation marks and citation omitted).

Defendant's conclusory assertion that the damages award is excessive is not sufficient to overcome the jury's decision. Although Defendant argues that the jury's compassion for Mrs. Munguia colored their assessment of her damages, Defendant does not explain how the jury's damages award is wrong. Defendant does not identify the portions of the award with which it finds fault, or suggest the amount of damages that it believes is proper. Defendant did not offer evidence on the damages question at trial.

Plaintiffs provided evidence that Mrs. Munguia was severely injured by the fall, suffered considerable resulting damages. Mrs. Munguia's neurosurgeon, Dr. Timothy Hopkins, testified that her L-1 vertebra in her lower back was fractured in a manner consistent with her description of having fallen onto her buttocks. (Transcript of Dr. Timothy Hopkins's video-taped deposition, entered into evidence at trial, at 11, 45 (Doc. 89-1)). Dr. Hopkins performed a surgery on Mrs. Munguia as a result of the injury from her fall, which involved the placement of rods and screws. (<u>Id.</u> at 16-17, 27). After her surgery, Mrs. Munguia suffered a spontaneous fracture in her L-4 vertebra. (<u>Id.</u> at 27). Dr. Hopkins testified that the instruments placed in her back likely contributed to causing the fracture, in combination with

her severe osteoporosis. (Id.). As a result of her injuries, Mrs. Munguia was left with a deformity in her back that forces her to walk with a stoop, and significantly limits her ability to move. (Id. at 35). The parties agreed that Mrs. Munguia's medical expenses were $166,277.55. (See Trial Exhibit 127).

Dr. Rodney Isom, a rehabilitation consultant with a Ph.d. in Human Rehabilitation, testified that Mrs. Munguia would continue to be largely confined to a wheelchair for mobility and only able to take a few steps, and would be permanently disabled from work. (Transcript of Trial, October 1, 2010, at 18-19 (Doc. 158)). He testified that Mrs. Munguia would suffer chronic pain and require assistance for basic daily living needs:

> She's in severe, chronic pain all the time. She's taking a ton of medication, so it would also be problematic with her working. . . . She doesn't sleep well because of her chronic pain. She has to rest during the day. Sometimes her pain level is so high, that she doesn't get out of bed at all. . . . She needs assistance with her activities of daily living, like going to the bathroom, getting dressed, bathing, et cetera.

(Id. at 19). Plaintiffs submitted evidence that a life-care plan for Mrs. Munguia would cost approximately $2,100,000, and that she had lost wages in excess of $480,000. (See Transcript of Trial, October 5, 2010, at 15 (Doc. 160); Trial Exhibits 64, 65, 68). Dr. Robert Male, an economic damages expert, testified that Mrs. Munguia would have a total economic damages loss of $2,654,100. (Transcript of Trial, October 5, 2010, at 16 (Doc. 160))

Mrs. Munguia testified regarding the extreme emotional and physical hardship she experiences as a result of her injuries. She testified that her inability to work is a source of great sadness and depression, that she is pained that her daughter is afraid to let her hold her grandchildren, and that she is forced to decide on a daily basis whether to suffer extreme physical pain or take medication that puts her in a foggy mental state. (Transcript of Trial, October 4, 2010 at 35-41 (Doc. 159)).

A jury's damages verdict is entitled to "substantial deference" and must be upheld unless it is "clearly unsupported by the evidence." In re Exxon Valdez, 270 F.3d 1215, 1247-48 (9th Cir. 2001) (qouting Stinnett v. Damson Oil Corp., 813 F.3d 1394, 1398 (9th Cir. 1987). Defendant put on no witnesses or any other evidence at trial to controvert Plaintiffs' evidence of damages. Defendant argues that the damages award is excessive, but points to no evidence in support. Defendant does not identify the portions of the jury award that are excessive or provide any explanation of why the award is improper. A party requesting a "remittitur bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Currier v. United Technologies Corp., 393 F.3d 246, 256 (1st Cir. 2004) (internal quotation marks and citation omitted). Defendant has not met its "heavy burden" of proving to

the Court that it is entitled to a remmittitur.

**D. Conclusion**

Because the "mode of operation" jury instruction was proper, the jury verdict was not against the clear weight of the evidence, and the damages award was supported by the evidence, Defendant's Alternative Motion for a New Trial or for Remittitur is **DENIED.**

**III. Plaintiffs' Motion for Rule 11 Sanctions**

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 11 allows the court to sanction a party or attorney who makes improper or frivolous representations in a pleading, written motion, or other submission. Fed. R. Civ. P. 11(c). Rule 11 provides that an attorney or unrepresented party who presents any paper to the court certifies that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  If these representation requirements are violated, the court has discretion to impose sanctions. <u>Warren v. Guelker</u>, 29 F.3d 1386, 1389 (9th Cir. 1994).  Although the court has discretion to decide the appropriate type of sanction, the sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).

## ANALYSIS

Plaintiffs move the Court to sanction Defendant for factual contentions made in its Renewed Motion for Judgment as a Matter of Law, or Alternative Motion for a New Trial or Remittitur. Plaintiffs argue that the Motion violates Federal Rule of Civil Procedure 11 ("Rule 11") because it misrepresents the record with factual contentions that lack evidentiary support.  Specifically, Plaintiffs point to the following two contentions made by Defendant: (1) "The clear weight of the evidence in this case is that Plaintiff fell forward because she tripped;" and (2) "No one saw any slippery substance on the floor because there was none." (Memorandum in Support of Renewed Motion for Judgment as a Matter of Law at 16 (Doc. 155)).

Rule 11 requires a party submitting a filing to certify, to the best of their knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that:

(3) the factual contentions have evidentiary support .
. . ; and

(4) the denials of factual contentions are warranted on
the evidence or, if specifically so identified, are
reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b)(3), (4).  If the Court determines that Rule
11(b) has been violated, "after notice and a reasonable
opportunity to respond . . . the court may impose an appropriate
sanction on any attorney, law firm, or party that violated the
rule or is responsible for the violation." Fed. R. Civ. P.
11(c)(1).

## A.    Defense Theory That Mrs. Munguia Tripped And Fell Forward

Defendant maintains that the weight of the evidence reflected
that Mrs. Munguia fell forward, because "immediately after her
fall, she was seen lying on her stomach with her head forward, out
in the aisle." (Renewed Motion for Judgment as a Matter of Law at
16 (Doc. 155)).  Defendant argues that it is "simply not possible
that Mrs. Munguia slid and fell [onto her buttocks] as she
described" because she "immediately ended up on her stomach with
her head facing forward." (Id.).

There was no testimony that Mrs. Munguia fell forward rather
than backward onto her buttocks.  Defendant presents its theory as
an interpretation of the evidence presented.  The evidence of the
manner in which Mrs. Munguia fell came from Mrs. Munguia, who
testified that she fell onto her buttocks and then rolled onto her

stomach because of the pain. (<u>See</u> Transcript of Trial, October 4, 2010, at 13-14 (Doc. 159)). No witnesses testified to the contrary.

Mrs. Munguia's description of her fall was supported by the testimony of her treating neurosurgeon, Dr. Timothy Hopkins, who testified that she suffered a L-1 vertebra fracture consistent with having fallen on her buttocks. (Transcript of Dr. Timothy Hopkins's video-taped deposition, entered into evidence at trial, at 45 (Doc. 89-1)).

Dr. Gill, Plaintiffs' expert witness, testified that there was nothing to suggest that Mrs. Munguia tripped and fell forward, "other than speculation." (Transcript of Trial, September 30, 2010, at 56 (Doc. 157). He testified that it is common for persons who experience a painful fall to move in "[w]hatever [way] they can to get the pressure and pain off their body." (<u>Id.</u> at 58). No witnesses at trial testified to seeing Mrs. Munguia fall, and no evidence was presented to controvert her description that she fell backwards onto her buttocks.

Defendant's contention that the weight of the evidence showed that Mrs. Munguia fell forward is a theory without evidentiary support. There was no testimony that Mrs. Munguia fell in any manner other than backward onto her buttocks.

**B.   Defendant's Allegation That There Is No Evidence That There Was A Contaminant On The Floor Causing Mrs. Munguia To Slip Is Inconsistent With The Evidence**

Defendant's contention that no one saw any slippery substance on the floor is inconsistent with the evidence.   Mrs. Munguia testified that after she fell she saw something on the floor that was darkish and about the size of a quarter. (Transcript of Trial, October 4, 2010, at 19-21 (Doc. 159)).

Ms. Presley testified that she saw a syrup-like substance near where Ms. Munguia fell, and that it reminded her of a McGriddle:

> A.   [Ms. Presley] . . . [T]he manager then asked us if there was anything on the floor.  And until that point, I hadn't even looked at the floor or thought about looking at the floor.  My only concern was Bev.  And when I looked down to my right, there was a spot on the floor.  And as my sister said, it is – it was a quarter-size.  And I turned to the manager, and I said, "There is a spot on the floor."  And I scooted my chair back.  He leaned over me, and looked down, and said, "Uh-huh."
>
> . . .
>
> A.   It was syrupy or something else, an it had little black dots in it. . . .
>
> . . .
>
> A.   It reminded me of a McGriddle.

(Id. at 72, 83).

Prior to trial, Defendant argued that there was no evidence of a contaminant on the floor that caused Mrs. Munguia to fall. (Memorandum in Support of Motion in Limine No. 1 at 2-3 (Doc. 78-

1)). At the pretrial hearing on the motions in limine, the Court pointed out that in her deposition, Mrs. Munguia testified that after falling she saw "something the size of a quarter." (Minute Order, September 21, 2010, at 13 (Doc. 126)). Ms. Presley testified in her deposition that she saw what appeared to be "oil or something off of a McGriddle type of sandwich and it had like black dots in it." (Id.). The Court ruled that if such evidence came into evidence at trial, Defendant could not state to the jury that there is no evidence of a contaminant on the floor. (Id. at 13-14). It is for the jury to decide what value to place on the witnesses' testimony.

Evidence was introduced at trial that there was a contaminant on the floor. The evidence that a contaminant was on the floor included circumstantial evidence. The jury is entitled to rely on circumstantial evidence. As the Court instructed the jury:

> Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is indirect evidence, that is, proof of a chain of facts from which you could find that another fact exists, even though it has not been proved directly.

(Jury Instructions, Instruction No 9, at 10 (Doc. 145)). Dr. Gill's testimony that Mrs. Munguia would not have slipped in the manner she described but for the presence of some contaminant under her foot, constitutes circumstantial evidence. The jury may properly rely on such evidence.

At trial, the Court advised Defendant's counsel that he could

not say there was no evidence of anything on the floor:

> MR. SHIGEKANE: There is no direct evidence that there is any contaminant on the floor, and yet he is allowed to say that there was a contaminant.

> THE COURT: She's [Mrs. Munguia] testified --

> MR. CRUISE: She's testified to that.

> THE COURT: She's testified.  That's evidence.  You may not like it, but it's evidence.  You can attack it.  You can cross-examine it.

> . . .

> MR. SHIGEKANE: I have been consistently saying there was no evidence of something on the floor. Your Honor has ruled that I cannot say that.  That you feel that there is evidence on the floor.  So, I'm --

> THE COURT: You can attack whether there was something on the floor.  I have no problem with you questioning anybody's testimony.  That is always your right. What I have said you cannot do is to say no evidence.  Because if there is evidence, you have to deal with it.  You can't just say that's not evidence.

(Transcript of Trial, October 5, 2010, at 117 (Doc. 160)).

Defendant's contention that the weight of the evidence reflected that Mrs. Munguia fell forward is patently false; there was **no** evidence presented that Mrs. Munguia fell forward. Defendant's contention that there was no evidence that anything was on the floor contradicts the evidence presented at trial; as the Court pointed out to Defendant both before and during trial, there was evidence of a contaminant on the floor.  A jury could conclude there was a contaminant on the floor.  Defendant's contentions reflect overzealous advocacy on the part of

74

Defendant's counsel.  The Court cautions Defendant's counsel to be aware of the requirements of Federal Rule of Civil Procedure 11. Although Defendant's counsel's factual contentions violate Rule 11, whether sanctions are ultimately imposed under Rule 11 is within the discretion of the Court. <u>Warren v. Guelker</u>, 29 F.3d 1386, 1389 (9th Cir. 1994).  The Court declines to impose sanctions.  Plaintiffs' Motion for Rule 11 Sanctions is **DENIED.**

**CONCLUSION**

Defendant's Renewed Motion for Judgment as a Matter of Law or Alternatively, For New Trial or For Remittitur (Doc. 155), is **DENIED.**

Plaintiffs' Motion for Rule 11 Sanctions (Doc. 168) is **DENIED.**

IT IS SO ORDERED.

DATED: April 8, 2011, Honolulu, Hawaii.



/S/ Helen Gillmor

Helen Gillmor
United States District Judge

*Beverly Munguia and Ruben Munguia v. Grelyn of Maui;* Civil No. 09-00058 HG-BMK; **ORDER DENYING DEFENDANT GRELYN OF MAUI, LLC'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY, FOR NEW TRIAL OR FOR REMITTITUR, AND DENYING PLAINTIFFS BEVERLY AND RUBEN MUNGUIA'S MOTION FOR RULE 11 SANCTIONS (DOCS. 155, 168).**